# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| ARI ROSTOWSKY | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2022-0004-SG |
| | ) | |
| LAURA M. HIRSCH and | ) | |
| LISA M. TRUE, | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| -and- | ) | |
| | ) | |
| AITHER HEALTH, LLC, | ) | |
| | ) | |
| Nominal Defendant. | ) | |

## MEMORANDUM OPINION

Date Submitted: May 8, 2024
Date Decided: October 15, 2024

Daniel C. Herr, LAW OFFICE OF DANIEL C. HERR LLC, Wilmington, Delaware; OF COUNSEL: Barry F. Fagel, LINDHORST & DREIDAME CO., L.P.A., Cincinnati, Ohio, *Attorneys for Plaintiff Ari Rostowsky*.

David B. Anthony, BERGER MCDERMOTT LLP, Wilmington, Delaware; Brian Gottesman, GABELL BEAVER LLC, Wilmington, Delaware, *Attorneys for Defendants Laura M. Hirsch and Lisa M. True*.

Alisa E. Moen, MOEN LAW LLC, Wilmington, Delaware, *Attorney for Nominal Defendant Aither Health LLC*.

**GLASSCOCK, Vice Chancellor**

This post-trial opinion addresses the ownership interest held by Plaintiff, Ari Rostowsky, in a business he formed with Individual Defendants, Laura Hirsch and Lisa True. The business is formally structured as a Delaware LLC, Aither Health. It is a service business related to administration of health insurance claims. Plaintiff avers that he is a member of the LLC. However, there is a written LLC operating agreement that states that there are only two members of the LLC, Hirsch and True. Plaintiff advances another claim, however; that he is entitled to a share of the business under the rubric of promissory estoppel. The record at trial demonstrates that Plaintiff is entitled to a 15% share of the business (or damages) under that theory, based on the following facts. The parties, including Plaintiff, created the company. The parties also made clear in their business plan that Plaintiff was a "Founder" of the company. They did not disclose to him that they had executed an LLC operating agreement that excluded him, and Plaintiff expected and attempted to facilitate an LLC operating agreement that would acknowledge his interest. Defendants relied on these assertions and omissions to benefit themselves and the LLC at Plaintiff's expense, most notably by 1) causing Plaintiff to work for more than a year without pay based on his understanding that the waxing value of his equity would eventually compensate him, and 2) relying on Plaintiff to secure a start-up loan to the business from a company in which his father was a principal. The million-dollar loan was made without collateral, was not convertible to equity, and

1

was guaranteed only personally by Defendants. This loan was based on a business plan that referred to Hirsh, True, and Plaintiff as "the Founders," and Plaintiff's father testified that he would not have approved the loan absent the parties holding Plaintiff out as a co-owner.

Finally, in an email to Plaintiff by True, copied to Hirsch, True stated that Plaintiff owned 15% of Aither's business. Hirsch did not dissent. I find by clear and convincing evidence that Hirsch and True are estopped from asserting that Plaintiff is not a 15% owner of Aither's business, although not a member of the LLC under the LLC operating agreement.

Plaintiff eventually left his work for Aither. Subsequently, the parties disagreed about Plaintiff's stake in Aither, which Plaintiff argued should be 1/3, and which Defendants insisted was inchoate and unvested.[1]

This Memorandum Opinion leaves other matters unresolved, including how equity should vindicate Plaintiff's rights. I address here only the issue described above.

---

[1] Defendants argue, without the support of written evidence, that Plaintiff agreed to five year's labor as a condition precedent for receiving a share of Aither, a term of service he failed to complete. One wonders whether, upon completion of the term, like Jacob (Genesis 29:20–35), Plaintiff would have received less attractive equity.

# I. BACKGROUND[2]

### 1. The Parties

Plaintiff Ari Rostowsky ("Ari" or "Plaintiff") is the former Senior Vice President of Business Development[3] of Aither Health, LLC ("Aither" or the "Company").[4]

Defendant Laura Hirsch ("Hirsch") is co-CEO of Aither and is a managing member of Aither.[5]

Defendant Lisa True ("True" and collectively with Hirsch, the "Defendants") is co-CEO of Aither and is a managing member of Aither.[6] Together, Hirsch and True control Aither.[7]

Defendant Aither is a Delaware limited liability company involved in the business of third-party administration of health insurance claims ("TPA").[8]

---

[2] This Memorandum Opinion only contains facts necessary to my analysis. Citations to the parties' joint trial exhibits are referred to by the numbers provided by the parties and cited as "JX __". *See* Ex. A to Joint Pre-Trial Stipulation and [Proposed] Ord., Dkt. No. 46; Ex. 97, Dkt. No. 65. Citations to the parties' stipulated pre-trial order are cited as "PTO ¶ __". Joint Pre-Trial Stipulation and [Proposed] Ord., Dkt. No. 46. References to the trial transcripts are cited as "Tr. __:__". 09-07-2023 Tr. of Evid. Hr'g, Dkt. No. 49.

[3] Tr. (A. Rostowsky) 30:10–12.

[4] PTO ¶ 11.

[5] JX71; Tr. (True) 249:7–12.

[6] JX71; Tr. (True) 249:7–12.

[7] JX71.

[8] JX24; JX97 at 4.

Non-party Richard Rostowsky ("Richard") is Ari's father and a former owner of a TPA named S&S Healthcare.[9]

### 2. The Parties Prior Involvement with TPAs

Prior to joining Aither, Plaintiff worked in sales for his father's TPA, S&S Healthcare, from September 2011 to April 2019.[10]  Hirsch and True met Plaintiff at their place of employment, Nova Healthcare, another TPA company.[11]  S&S Healthcare provided services to Nova Healthcare.[12]  In August 2018, Richard and his business partner sold S&S Healthcare to a private equity company.[13] At the time of the sale, Plaintiff signed an employee agreement that contained a non-compete and non-solicitation clause.[14] After the sale, S&S Healthcare terminated Plaintiff's employment in April 2019.[15]

In April 2019, Plaintiff, Hirsch, and True began discussions about going into business together by purchasing Significa Benefits, an existing TPA.[16]  Hirsch and True learned of Significa Benefits through Plaintiff.[17]  Plaintiff introduced Significa Benefits personnel to Hirsch and True, and the pair expressed an interested in buying

---

[9] PTO ¶¶ 1–4.  I refer to the Rostowskys by first name in the interest of clarity; no familiarity or disrespect is intended.
[10] *Id.* ¶¶ 1–2.
[11] Tr. (True) 190:8–191:13; Tr. (A. Rostowsky) 81:8–82:8.
[12] Tr. (True) 190:8–191:13; Tr. (A. Rostowsky) 81:19–82:8; PTO ¶ 5.
[13] PTO ¶ 3.
[14] Tr. (A. Rostowsky) 8:17–9:9; JX68.
[15] PTO ¶ 4.
[16] Tr. (A. Rostowsky) 14:11–15:18; Tr. (True) 230:6–231:11.
[17] Tr. (A. Rostowsky) 14:11–15:4.

the company.[18]   After two meetings with Significa Benefits, Hirsch and True prepared a business plan which outlined the following ownership structure: Hirsch and True would each own 30%, Plaintiff would own 15%, and two other individuals would own 20% and 5%.[19]   Plaintiff did not agree to the ownership breakdown.[20] Ultimately, and in any event, Plaintiff, Hirsch, and True decided that purchasing Significa Benefits was not an ideal business decision and settled on forming their own TPA.[21]

### 3. The Formation of Aither Health LLC

In summer 2019, the parties took steps toward forming Aither.  On July 2, 2019, Hirsch and True executed a certificate of formation,[22] initial resolutions,[23] and an operating agreement for Aither.[24]  The operating agreement listed and currently lists only Hirsch and True as members of the Company.[25]  For the admittance of new members, Section 1.8 of Aither's operating agreement requires unanimous written consent of all members.[26]  Plaintiff asserts he was not aware of the execution of the operating agreement and believed Aither did not have an executed written operating

---

[18] *Id.*; Tr. (True) 230:6–24, 232:14–233:11.
[19] Tr. (True) 195:21–196:2, 232:14–233:11; JX3.
[20] Tr. (A. Rostowsky) 16:20–17:9.
[21] *Id.* at 18:20–20:6; Tr. (True) 235:11–236:20; JX7.
[22] JX71.
[23] JX83.
[24] JX10.
[25] *Id.* at 12.
[26] *Id.* at 2.

5

agreement.[27]  Defendants assert that Plaintiff is not an owner of the Company, but instead, Plaintiff agreed to earn a 15% non-voting ownership interest in the Company after five years of work[28] and agreed not to be compensated for any work until Aither could afford to do so.[29]  Defendants contend that, in exchange, Plaintiff did not have to guarantee the Company's debt or make capital contributions.[30]

After Hirsch and True executed the operating agreement, the parties evaluated options for funding the venture.[31]  The parties prepared an updated business plan on July 27, 2019 that listed Plaintiff, Hirsch, and True as "Founders."[32]

The business plan attributed various company functions to the "Founders," such as "Expansion Plan," "Investor Equity," and "Exit Strategy."[33] In addition, the business plan refers to the parties' ownership of the Company using the possessive form "their."[34] For instance, the business plan's "Management Team" section lists each party (including Plaintiff) as a part of the Company's management team.[35] The "Management Team" section details each parties' respective background in the industry and states that "[the parties'] combined expertise and industry network, will

---

[27] Tr. (A. Rostowsky) 46:2–23. *See also* First Am. Verified Member Compl. Asserting Deriv. and Direct Claims ¶ 4, Dkt. No. 11 ("First Am. Compl.").
[28] Tr. (True) 207:12–17, 246:19–23, 264:1–18.
[29] *Id.* at 200:17–201:7.
[30] *Id.* at 200:17–19, 211:21–212:4.
[31] Tr. (A. Rostowsky) 22:2–22.
[32] JX97 at 4.
[33] *Id.* at 5–6.
[34] *See* JX97.
[35] *Id.* at 5.

bring the operations of *their* business to profitability within its first two years."[36] In addition, the business plan states "[t]he Founders intend to grow the Company for at least 10–15 years. Eventually, the Company will hire a qualified business broker to sell the business [on] *their* behalf."[37] Further, the "Organizational Budget" section of the business plan listed three owners of the Company.[38] This section of the business plan did not specify who those owners were.[39]

Hirsch also prepared a five-year forecast for Aither.[40] For an employee projection for 2019 to 2024, Hirsch put "Co CEO, Co CEO, SVP Business Development" under the "Owners" section of the table.[41] At trial, True testified that "SVP of business development" referenced Plaintiff.[42]

Plaintiff proposed that the parties borrow startup money from his father in order to fund the venture.[43] Hirsch and True emailed Richard and his business partners the updated version of Aither's business plan[44] as well as a July 27, 2019 version of the five-year financial forecast.[45] Richard testified that his understanding

---

[36] *Id.* (emphasis added).

[37] *Id.* at 6 (emphasis added).

[38] *Id.* at 21.

[39] *Id.*

[40] Tr. (A. Rostowsky) 28:24–32:14; Tr. (True) 248:11–249:15; JX17a.

[41] JX17a at 32.

[42] Tr. (True) 248:11–249:15.

[43] Tr. (A. Rostowsky) 22:2–11; Tr. (True) 238:6–8.

[44] JX13; JX97.

[45] JX17; JX17a. In my factual findings and analysis, I rely on the employee projection table in the financial forecast. I note that the parties submitted the September 5, 2019 version of the five-year forecast as Joint Exhibit 17a rather than the version of the forecast that was attached to the July 27, 2019 updated business plan given to Buffalo Enterprises. JX13; JX17; JX17a. However, at

7

of the business plan was that Plaintiff would be a part owner of Aither.[46] Richard further testified that based on his understanding of the ownership structure of Aither, he decided with his partners to agree to loan the money to Aither.[47] Specifically, Richard testified that he would not have provided the loan to Aither if Plaintiff was not an owner of Aither.[48] In addition, Richard stated that he discussed with Hirsch Plaintiff's desire to not disclose his involvement with Aither due to the non-compete and non-solicitation clauses with S&S Healthcare, which restricted, or may have restricted, Plaintiff's participation in Aither.[49]

Aither entered into a promissory note with Buffalo Enterprises, LLC, an entity owned in part by Richard,[50] on October 1, 2019, wherein Aither agreed to repay $1,000,000.[51] Hirsch and True personally guaranteed the loan, but provided no collateral, with the creditor agreeing to rely solely on their personal guarantees.[52] According to Richard, Plaintiff did not guarantee the loan because Richard would

---

trial, True testified that the employee projection table in Joint Exhibit 17a was included in the five-year forecast attached to the July 27, 2019 updated business plan. Tr. (True) 248:11–249:15. In other words, for the purposes of my findings and analysis, the difference in the forecast versions submitted to the Court and to Buffalo Enterprises is not material, as I rely on the employee projection table that appears in both versions.

[46] Tr. (R. Rostowsky) 165:1–24, 166:1–14, 166:23–167:7, 167:8–23.

[47] *Id.* at 168:13–169:3.

[48] *Id.* at 169:21–170:12.

[49] *Id.* at 171:6–23. At this time, Plaintiff was involved in a lawsuit with S&S Healthcare relating to his employment agreement. Tr. (A. Rostowsky) 32:23–33:8.

[50] Tr. (R. Rostowsky) 171:24–172:3.

[51] JX20. In addition to the loan that Hirsch and True received, the pair contributed their personal funds to Aither. Tr. (True) 267:12–22.

[52] JX20; Tr. (R. Rostowsky) 170:13–15, 182:16–23; Tr. (True) 211:13–212:4, 251:13–252:19.

assume responsibility for any potential liability that his son incurred.[53] The terms of the loan provided that repayment of the loan would commence with interest-based payments on September 1, 2020 and repayment of the principal on January 1, 2022 for a five year period.[54]

Prior to the execution of the promissory note, Jeffrey Steinberg, a member of Buffalo Enterprises, requested via email Aither's articles of organization and a "Corp resolution stating intent to borrow money from Buffalo Enterprises" to send to an attorney.[55] Richard did not request a copy of Aither's operating agreement.[56] On October 2, 2019, True emailed Steinberg a copy of Aither's Certificate of Formation along with minutes of a special meeting of Aither.[57] An excerpt from the meeting minutes reads: "The following members and/or managers were present at this special meeting: Lisa M. True Laura M. Hirsch being all the members of the Limited Liability Company."[58]

### 4. Plaintiff's Involvement with Aither

During the Company's startup period, Plaintiff contributed to its marketing by recruiting a friend of his to create Aither's logo and color scheme.[59] Plaintiff

---

[53] Tr. (R. Rostowsky) 170:16–171:1.
[54] JX20.
[55] JX24; Tr. (R. Rostowsky) 163:9–13, 176:3–7; Tr. (True) 206:1–3.
[56] Tr. (R. Rostowsky) 173:18–174:12.
[57] JX24.
[58] *Id.*
[59] Tr. (A. Rostowsky) 35:20–36:9.

disseminated marketing materials to prospective customers which identified Hirsch and True as the only members of Aither.[60] In addition, Plaintiff was aware of license filing applications in different states that identified Hirsch and True as the sole members of Aither.[61] Plaintiff did not object or assert that Aither was making inaccurate statements in its filings.[62]

While ramping up Aither's business, Plaintiff, Hirsch, and True agreed to forgo compensation until Aither became profitable.[63] Plaintiff did not receive compensation for eighteen months but provided services to the company 80 to 90 hours per week during that time period.[64] Utilizing an email address owned by True's other business, Plaintiff worked behind the scenes until Plaintiff was released from his non-compete agreement with S&S Healthcare in October 2019.[65] Afterwards, True created an official Aither email address for Plaintiff.[66] However, Plaintiff did not revise the marketing materials to reflect his alleged ownership.[67] According to Plaintiff, he was content with the materials not reflecting his alleged

---

[60] *Id.* at 153:24–154:13.
[61] *Id.* at 152:7–153:8, 153:13–17, 156:4–11; JX85; JX87; JX90.
[62] *See* Tr. (A. Rostowsky) 152:7–153:8, 153:13–17, 156:4–11; JX85; JX87; JX90.
[63] Tr. (A. Rostowsky) 36:13–38:3; Tr. (True) 200:17–201:7, 215:7–216:4.
[64] Tr. (A. Rostowsky) 36:17–38:6, 48:1–2; Tr. (True) 201:2–11, 254:11–255:2, 265:2–6.
[65] Tr. (A. Rostowsky) 39:15–41:13; JX95.
[66] Joint Post-Trial Stipulation of Facts ¶ 5, Dkt. No. 52.
[67] Tr. (A. Rostowsky) 153:24–155:17.

ownership since he did not want to confuse the public's view of Aither and disrupt the Company's reputation, potentially stunting its growth.[68]

In 2020, Plaintiff brought in Aither's first client.[69] Throughout 2020, Hirsch, True, and Plaintiff discussed the Company's strategy, employee hiring, and the Company's financial status on a high-level basis.[70]  In addition, Plaintiff recruited employees for the Company.[71] The Company grew quickly[72] and at the start of the new year of 2021, in a text message to Plaintiff with True copied, Hirsch wrote "Thank you for putting up with us and for being our partner!!! Here's to another awesome year!!!"[73]  In April 2021, Aither began to make a profit, and the parties began to draw base salaries.[74]  Plaintiff's pay was based on an annual payment structure of $125,000.[75]

     5. Communications Regarding Plaintiff's Ownership Interest in Aither

After S&S Healthcare released Plaintiff from his employment agreement, Plaintiff had discussions with Defendants about signing a written operating agreement.[76]  In October 2019, Plaintiff visited Hirsch's house in Buffalo, New York

---

[68] *See id.* at 154:14–155:17.
[69] *Id.* at 44:5–9.
[70] *Id.* at 49:20–50:5.
[71] *Id.* at 50:1–5.
[72] *Id.* at 47:18–24.
[73] JX44.
[74] Tr. (A. Rostowsky) 64:6–65:6.
[75] *Id.* at 145:3–5.
[76] *Id.* at 41:14–23.

11

with the expectation of executing a written operating agreement.[77] According to Plaintiff, however, when he arrived there was not an operating agreement available for him to sign.[78] Later in December that same year, Plaintiff travelled to Buffalo again to execute an operating agreement, but (according to Plaintiff) Defendants said that they could not sign because True was too distracted, having learned that her father was diagnosed with a severe illness.[79] In February 2020, Plaintiff travelled to Dallas, Texas for a conference and with the goal to execute an operating agreement.[80] Once again, Hirsch and True told Plaintiff the agreement was not ready to be signed.[81] On August 15, 2020, True replied to an email from Plaintiff, wherein Plaintiff attached a draft NDA that he signed, stating "technically as a minority you don't have authority to bind Aither."[82] Plaintiff did not refute this characterization of his ownership.[83]

### 6. Plaintiff's Resignation from Aither

Finally, in 2021, Plaintiff's frustration with Hirsch and True came to head. On February 9, 2021, Plaintiff and True had a phone call about creating an operating

---

[77] *Id.* at 41:20–43:1.
[78] *Id.* at 42:19–43:1.
[79] *See* Tr. (A. Rostowsky) 43:2–44:4. During this time, Plaintiff also visited a potential client in Syracuse, New York. *Id.* at 44:2–4.
[80] *Id.* at 44:21–45:22.
[81] *Id.* at 45:4–8.
[82] JX79.
[83] Tr. (A. Rostowsky) 116:16–117:1.

agreement to memorialize his ownership interest.[84]  That night, True sent a follow-up email after the phone call, to Plaintiff and copied to Hirsch, stating that Plaintiff had a 15% ownership interest in Aither.[85]  True testified that her statement in the email was incorrect, and intended to avoid further discussion because True was tired and frustrated.[86]  Plaintiff did not refute True's characterization of his ownership interest as limited to 15%, as he contends he was relieved that Hirsch and True finally recognized his ownership status, at all.[87]  In a similar vein, Hirsch did not object to True's email confirming Plaintiff's ownership status.[88]

In June 2021, Plaintiff asked Hirsch via text to provide him with K-1 tax documents for the 2020 year.[89]  This request implied that he was an owner of Aither, who would be entitled to a K-1.  Hirsch responded: "We haven't done the taxes. It's going to take awhile for me to catch everything up."[90]  Defendants did not refute Plaintiff's entitlement to the K-1 tax documents.[91]

Ultimately, because he had to "pull[] teeth" to get paid by Defendants and was stressed from working for the Company, Plaintiff resigned from Aither on June

---

[84] *Id.* at 59:13–61:7.
[85] JX49.
[86] Tr. (True) 217:9–219:1, 261:1–262:5.
[87] Tr. (A. Rostowsky) 63:8–64:5.
[88] Tr. (True) 262:6–18.
[89] JX53.
[90] *Id.* at 2.
[91] *Id.*; Tr. (A. Rostowsky) 68:4–16.

13

21, 2021.[92] Upon Plaintiff's resignation, Hirsch and True asserted that Plaintiff was not an owner of Aither.[93] Specifically, Hirsch and True claimed that Plaintiff's 15% ownership interest was inchoate, and would vest only after Plaintiff worked at Aither for five years.[94] In addition, Defendants claim that Plaintiff agreed to accept (once his interest vested) a non-voting ownership.[95]

*B. Procedural History*

Plaintiff filed his initial Complaint on January 3, 2022,[96] and later filed an Amended Complaint on April 19, 2022.[97] The Amended Complaint asserts the following causes of actions: Count I (Declaratory Judgment Recognizing Plaintiff's Ownership of Aither), Count II (Breach of Contract Against All Defendants), Count III (Breach of Fiduciary Duty Against Hirsch and True), Count IV–VI (Unjust Enrichment, Quantum Meruit, and Promissory Estoppel Against All Defendants), Count VII (Fraud Against Hirsch and True), Count VIII (Violation of the Fair Labor Standards Act, 29 U.S.C. § 201, et. seq. Against Aither).[98]

---

[92] Tr. (A. Rostowsky) 69:3–70:4; PTO ¶ 11.
[93] Tr. (A. Rostowsky) 71:15–23.
[94] Tr. (True) 200:17–201:23, 246:19–23, 262:1–265:6.
[95] *Id.* at 264:12–14.
[96] Verified Member Deriv. Compl., Dkt. No. 1.
[97] First Am. Compl.
[98] *Id.* ¶¶ 58–96.

Defendants filed a Motion to Partially Dismiss the Amended Complaint on May 23, 2022[99] and the parties fully briefed the Motion on July 15, 2022.[100] I held oral argument on the Motion to Dismiss on January 24, 2023, and held the Motion in abeyance.[101] I ordered an evidentiary hearing concerning solely whether Plaintiff is an owner of Aither.[102] I held trial in this matter on September 7, 2023.[103] The parties filed their respective post-trial briefs,[104] and I heard post-trial oral argument on April 9, 2024.[105] I requested parties to meet and confer on possible settlement and give a status update to the Court on April 30, 2024.[106] On May 1, 2024, the parties informed the Court that they were unable to reach a settlement.[107] On May 8, 2024, I wrote a letter to counsel informing the parties that I consider the matter submitted as of that date.[108]

---

[99] Defs.' Mot. to Partially Dismiss Pl.'s First Am. Verified Deriv. Member Compl., Dkt. No. 13.

[100] Defs.' Opening Br. in Supp. of Their Mot. to Dismiss Pls.' Am. Verified Member Deriv. Compl., Dkt. No. 14; Pl.'s Answering Br. In Opp'n To Defs.' Mot. For Partial Dismissal Of Pl.'s First Am. Compl., Dkt. No. 16; Defs.' Reply Br. in Further Supp. of Their Mot. to Partially Dismiss Pls.' Am. Verified Member Deriv. Compl., Dkt No. 17.

[101] Mot. to Dismiss before Vice Chancellor Sam Glasscock dated 1.24.23 re: Arg. Deferred; Counsel to meet and confer and contact Chambers re an Evid. Hr'g date, Dkt. No. 21.

[102] *Id.*

[103] Evid. Hr'g before Vice Chancellor Sam Glasscock dated 9.7.23, Dkt. No. 47.

[104] Defs.' Joint Post Trial Opening Br., Dkt. No. 53 ("Defs. PT OB"); Pl.'s Post-Trial Br., Dkt. No. 54 ("Pl. PT OB"); Defs.' Joint Post Trial Answering Br., Dkt. No. 58 ("Defs. PT AB"); Pl.'s Post Trial Answering Br., Dkt. No. 59 ("Pl. PT AB").

[105] Post Trial Oral Arg. before Vice Chancellor Sam Glasscock dated 4.9.24, Dkt. No. 62.

[106] Tr. of Post Trial Oral Arg. dated 4.9.24 ("Post-Trial Tr.") 75:5–76:7.

[107] Letter to the Ct. from Pl.'s Counsel: Status Update re Settlement, Dkt. No. 63.

[108] Letter to Counsel, Dkt. No. 64.

This Memorandum Opinion addresses only Plaintiff's ownership status in Aither and his ownership percentage.[109]

## II. ANALYSIS

The question before me is whether Plaintiff is an owner of Aither Health LLC, and if so, what percentage Plaintiff owns in the Company. I find that pursuant to the Delaware Limited Liability Act (the "LLC Act"), Plaintiff has not established that he is a member of Aither since he was not admitted as a member at the time of Aither's formation or at a later time pursuant to Aither's operating agreement.[110] The record, however, demonstrates that Plaintiff is entitled to relief pursuant to promissory estoppel.[111] My analysis follows.

---

[109] I note that there is a pending Motion in Limine before me. Defs.' Joint Mot. In Limine, Dkt. No. 39. First, Defendants seek to exclude as evidence Richard Rostowsky's deposition testimony and trial testimony because Richard did not answer questions relating to S&S Healthcare during his deposition. Defs.' Joint Pre-Trial Opening Br. 39–41, Dkt. No. 40. Second, Defendants seek to exclude as evidence emails pertaining to settlement negotiations and testimony from a witness who allegedly was not deposed nor identified by Plaintiff as a trial witness. *Id.* at 42–45. Lastly, Defendants seek an adverse inference against Plaintiff because, as Defendants argue, Plaintiff self-collected evidence and spoliated data from a cell phone during the pendency of this litigation. *Id.* at 35–39.

Richard Rostowsky's involvement with S&S Healthcare, the emails pertaining to settlement negotiations, and testimony from a witness who allegedly was not deposed nor identified as a trial witness, were not necessary to my analysis, and I decline to rule on that portion of the Motion. In regard to evidence Plaintiff self-collected, I find that an adverse finding against Plaintiff is not warranted. I find that Defendants' spoliation argument fails to satisfy Defendants' burden to demonstrate Plaintiff acted recklessly or intentionally. *See DG BF, LLC v. Ray*, 2021 WL 5436868, at *5 (Del. Ch. Nov. 19, 2021) (quoting *TR Invs., LLC v. Genger*, 2009 WL 4696062, at *17 (Del. Ch. Dec. 9, 2009)). Accordingly, I deny the request for an adverse inference against Plaintiff.

[110] *Robinson v. Darbeau*, 2021 WL 776226, at *8 (Del. Ch. Mar. 1, 2021) ("A member may be admitted at the time of formation or at a later time."); 6 *Del. C.* § 18-301(a)–(b).

[111] Defendants argue that Plaintiff did not raise the claim of a membership interest in Aither based on a theory of promissory estoppel, in his Complaint, Amended Complaint, pre-trial briefs, or pre-

16

*A. Plaintiff was not Admitted as a Member in Aither at the Time of Aither's Formation or Pursuant to the Method Required by its Operating Agreement*

I begin my analysis by determining whether Plaintiff was admitted into membership of Aither, an LLC. Under the LLC Act, a "member" is "a person who is admitted to a limited liability company as a member as provided in § 18-301."[112]

trial stipulation, thus waiving the argument. Defs. PT OB 45–46. Defendants further argue that it is prejudicial to allow Plaintiffs to seek an award of membership interest through promissory estoppel post-trial because Defendants could not have known to develop evidence to defeat this claim. *Id.*

    First, Plaintiff did raise the *theory* of promissory estoppel in his Amended Complaint (although Defendants assert it was only an alternative theory for monetary damages to compensate Plaintiff for his services at Aither rather than for an award of membership interest). First Am. Compl. ¶¶ 52, 75–84; Defs. PT OB 45–46. Defendants are free to argue that the proper remedy for the promissory estoppel theory is monetary damages rather than equity, in the next phase of this litigation. However, because Plaintiff did raise the theory of promissory estoppel in his Amended Complaint, Defendants were on notice of this argument both during discovery and at trial. As such, Plaintiff's argument for a membership interest under promissory estoppel is not prejudicial to Defendants and the discovery and trial they conducted. *Cf. In re PNB Hldg. Co. S'holder Litig.*, 2006 WL 2403999, at *22 n.117 (Del. Ch. Aug. 18, 2006) (barring defendants from relying on an exculpation clause where defendants raised the defense, which is "in the nature of an affirmative defense," after discovery was closed and after plaintiffs had shaped their trial plans, making it prejudicial to the plaintiffs (quoting *Emerald P'rs v. Berlin*, 726 A.2d 1215, 1223 (Del. 1999))); *Zaman v. Amedeo Hldgs., Inc.*, 2008 WL 2168397, at *15 (Del. Ch. May 23, 2008) (holding that defendants waive their affirmative defense because they did not give fair notice by raising it for the first time on the second day of trial when it was not included in their answer, pre-trial briefs, or pre-trial order).

    Further, both parties were able to address the promissory estoppel argument in their post-trial briefs and during the post-trial oral argument. Defs. PT OB 46–53; Defs. PT AB 31–34; Pl. PT OB 28–33; Pl. PT AB 24–31; Post-Trial Tr. 59:7–61:11, 67:3–68:1. Therefore, I find that Defendants have suffered no prejudice where promissory estoppel was raised in post-trial briefing prior to the post-trial oral argument. *Cf. In re IBP, Inc. S'holder Litig.*, 789 A.2d 14, 62 (Del. Ch. 2001) (finding that a party waived any arguments that were not raised in their opening post-trial brief); *Emerald P'rs v. Berlin*, 2003 WL 21003437, at *43 (Del. Ch. Apr. 28, 2003) (denying plaintiff's motion for leave to file a post-argument brief, after a post-trial oral argument, advancing an argument that has never been advanced in any briefing filed by the plaintiff in the action), *aff'd*, 840 A.2d 641 (Del. 2003); *In re Morrow Park Hldg. LLC,* 2020 WL 3415649, at *20 (Del. Ch. June 22, 2020) (holding that parties' second basis for promissory estoppel is waived because it was raised for the first time at oral argument for a motion for summary judgment and not in the complaint or brief in opposition to summary judgment).

[112] 6 *Del. C.* § 18-101(13).

6 *Del. C.* § 18-301 establishes different courses of action to admit a member into an LLC both in connection with the formation of an LLC and after the formation of an LLC.[113]

At the time of formation of an LLC, 6 *Del. C.* § 18-301(a) "permits a person to be admitted as a member 'when the person's admission is reflected in the records of the limited liability company.'"[114]

After the formation of an LLC, a person is admitted as a member of the LCC:

"In the case of a person who is not an assignee of a limited liability company interest, including a person acquiring a limited liability company interest directly from the limited liability company and a person to be admitted as a member of the limited liability company without acquiring a limited liability company interest in the limited liability company at the time provided in and upon compliance with the limited liability company agreement or, if the limited liability company agreement does not so provide, upon the consent of all members or as otherwise provided in the limited liability company agreement;"[115]

In summary, among other courses of action, a person can be admitted as a member of an LLC in connection with its formation if the person is identified as a member in the LLC's records at the time of formation, and after its formation pursuant to the requirements of the LLC's operating agreement. Accordingly, my

---

[113] *Id.* § 18-301(a)–(b).
[114] *Robinson*, 2021 WL 776226, at *8 (quoting 6 *Del. C.* § 18-301(a)(2)). "The records of a limited liability company at the time of formation include, *at a minimum*, the certificate of formation, and the LLC Act provides that members may be identified at the time of formation in the certificate of formation itself." *Id.* at *8 (emphasis added).
[115] 6 *Del. C.* § 18-301(b)(1).

analysis relies on Aither's records at the time of formation and Aither's written operating agreement.[116]

I turn first to whether Plaintiff was admitted as a member of Aither in connection with its formation. Plaintiff is not identified as a member of Aither in Aither's records at the time of formation, which include its certificate of formation, initial resolutions, and written operating agreement.[117] Thus, Plaintiff was not admitted as a member of Aither in connection with its formation.

Next, I turn to whether Plaintiff was admitted as a member of Aither after its formation pursuant to the requirements of Aither's written operating agreement. I

---

[116] Plaintiff argues that the written operating agreement has no legal effect, as in his view the parties came to an implied or oral operating agreement for Aither, which predated Aither's "secret" written operating agreement, recognized Plaintiff as a member, and could not be overridden by the "secret" written operating agreement without Plaintiff. Pl. PT OB 20–22. I disagree. "[T]he fact that an LLC agreement *may* be oral or implied does not change the fact that [LLC] had a written agreement. . . That agreement governs." *See Riverside Risk Advisors LLC v. Chao*, 2022 WL 14672745, at *20 (Del. Ch. Oct. 26, 2022, revised Oct. 28, 2022), *judgment entered*, 2023 WL 35348 (Del. Ch. Jan. 3, 2023), *and rearg. denied*, 2023 WL 5046760 (Del. Ch. Jan. 3, 2023), *aff'd*, 303 A.3d 51 (Del. 2023) (citing *A&J Cap., Inc. v. L. Off. of Krug,* 2018 WL 3471562, at *5 (Del. Ch. July 18, 2018)). Aither has a written operating agreement; I find that the written operating agreement governs.

Plaintiff argues that *Riverside* facts are materially different because the *Riverside* plaintiff began as an employee of the LLC *after* its formation, and she was never a member under the LLC's operating agreement that only lists other parties; therefore, the *Riverside* plaintiff was not able to block the execution of a later operating agreement. Pl. PT AB 6. I read *Riverside* differently. The *Riverside* plaintiff makes a similar argument to that of Plaintiff in this action—that she was kept in the dark of the existence of the LLC's written agreement for three and a half years, during which she was a member the entire time because LLC agreements can be oral or implied. Defs. Answer to Frosts Post Trial Br. at 10, *Riverside Risk Advisors LLC v. Grace I Ching Chao*, 2019-0789-KSJM, (Del. Ch. May 3, 2022). The Court in *Riverside* found that the LLC's written agreement governs. *Riverside*, 2022 WL 14672745, at *20. Similarly, I find that Aither's written operating agreement governs.

[117] *See* JX10 at 12; JX71; JX83.

19

find that he was not. Pursuant to Section 1.8 of Aither's written operating agreement, additional members could be admitted to the Company only by unanimous written consent of its members.[118] Plaintiff did not receive unanimous written consent from Hirsch and True. Although True sent an email to Plaintiff on February 9, 2021 stating that his ownership interest was 15%,[119] Hirsch did not respond to that email or otherwise provide written consent.

Plaintiff was not admitted as a member of Aither pursuant to its operating agreement.

*B. The Record Demonstrates that Plaintiff is Entitled to a Remedy Pursuant to Promissory Estoppel*

I now turn to whether the record demonstrates Plaintiff is entitled to relief pursuant to promissory estoppel. I find that he is. To prevail on a promissory estoppel claim, a plaintiff must establish that *by clear and convincing evidence*:

> (i) a promise was made; (ii) it was the reasonable expectation of the promisor to induce action or forbearance on the part of the promisee; (iii) the promisee reasonably relied on the promise and took action to his detriment; and (iv) such promise is binding because injustice can be avoided only by enforcement of the promise.[120]

---

[118] JX10 at 2.
[119] JX49.
[120] *Harmon v. State, Del. Harness Racing Comm'n*, 62 A.3d 1198, 1201 (Del. 2013) (quoting *Lord v. Souder*, 748 A.2d 393, 399 (Del. 2000)).

20

The predominant question in Delaware promissory estoppel cases is "whether injustice could be avoided only by enforcement of the promise."[121]

> 1. The Record Demonstrates that Hirsch and True Made a Promise to Plaintiff that He Would be an Owner of Aither with a 15% Interest

> > a. Hirsch and True Promised that Plaintiff Would be an Owner of Aither

Unless noted otherwise, the findings of fact below are made pursuant to the clear and convincing evidence standard.

Plaintiff testified that he was promised an ownership interest by Defendants,[122] and I find that the record, in addition to this testimony, demonstrates that he was promised an ownership interest by Defendants. The parties' communications amongst themselves and to third parties demonstrate that Hirsch and True made a promise that Plaintiff would be an owner of Aither. True referred to the existence of Plaintiff's ownership interest in various emails. For example, in one email to Plaintiff, True stated that Plaintiff owned a 15% interest in Aither.[123] In another email to Plaintiff, True categorized Plaintiff as "a minority" of Aither.[124] The record does not demonstrate that either Defendant recanted or objected to the existence of an ownership interest held by Plaintiff after these emails were

---

[121] *Grunstein v. Silva*, 2011 WL 378782, at *11 (Del. Ch. Jan. 31, 2011) (quoting *Grunstein v. Silva*, 2009 WL 4698541, at *7 (Del. Ch. Dec. 8, 2009)).
[122] Ex. A – Ari Rostowsky July 18, 2023 Tr. 91:1–93:22, Dkt. No. 41.
[123] JX49.
[124] JX79.

21

exchanged.[125] In addition, Plaintiff requested K-1 tax documents from Hirsch, and Hirsch's reply indicated that the K-1 would be forthcoming.[126] Plaintiff's request implied that he was an owner of Aither, who would be entitled to a K-1, and Defendants did not refute Plaintiff's entitlement to the K-1.

Further, the parties sent an updated business plan and five-year forecast to Buffalo Enterprises to secure an investment after the execution of Aither's operating agreement.[127] The business plan listed Plaintiff, Hirsch, and True as "the Founders."[128] The business plan refers to the parties' ownership of the Company using the possessive form "their."[129] For instance, the "Management Team" section details each parties' (including Plaintiffs') respective background in the industry and states that "[the parties'] combined expertise and industry network, will bring the operations of *their* business to profitability within its first two years."[130]

In addition, the five-year forecast, as included with the updated business plan, had a table that indicated the projected owners of Aither were two Co-CEOs and the SVP of Business Development for 2019 to 2024.[131] True testified that "SVP of business development" referred to Plaintiff.[132] These facts regarding the parties'

---

[125] *See* Tr. (True) 262:1–5, 262:9–18.
[126] JX53.
[127] JX10; JX13; JX17; JX17a; JX97.
[128] JX97 at 4.
[129] *See* JX97.
[130] *Id.* at 5 (emphasis added).
[131] JX17a at 32; Tr. (True) 248:11–249:15.
[132] Tr. (True) 248:11–249:15.

communications amongst themselves in combination with the updated business plan and five-year forecast clearly and convincingly support a finding that Hirsch and True promised Plaintiff an ownership interest in Aither, and acted in such a way as to acknowledge the promise.

Defendants make several arguments to negate these communications, but none is persuasive. Defendants argue that True was tired and frustrated when she sent the email that stated Plaintiff owned an interest in Aither.[133] Whatever the truth of this statement, I do not find this testimony persuasive as to either Defendants' or Plaintiff's understanding of Aither's ownership; True made no effort to refute the statement after she became calm and clear-minded.[134] Defendants further assert that True only stated that Plaintiff was a minority and had no authority to bind Aither because True was using it as a "coaching opportunity" to explain to Plaintiff that *at no point in time* would he be able to bind Aither, even if he became an owner years hence.[135] I also do not find this testimony credible, as a reasonable person would not refer to an individual as a "minority" owner if they in fact had no present interest in the company, and only an inchoate and conditional expectation of an interest in the future. These communications, to my mind, clearly acknowledge a present interest.

---

[133] *Id.* at 217:13–218:1, 260:9–261:24.
[134] *Id.* at 262:1–18.
[135] *Id.* at 219:4–220:11, 255:22–257:19.

Defendants also contend that Plaintiff being listed in the updated business plan as one of three "Founders" simply indicates that the parties developed the business concept together and does not indicate each of the Founders had an ownership interest in the Company itself.[136] I do not find this argument persuasive. The record indicates that Plaintiff took extensive efforts to develop Aither (the actual company and not just the concept), alongside True and Hirsch by assisting in finding its start-up investment,[137] securing the Company's first client,[138] and working without pay for eighteen months,[139] which I will discuss further below. These are consistent with the business plan's implication of a current interest. Defendants also contend that the five-year forecast, which indicates that there are three owners of the business,[140] was based on a "template" to forecast expenses, and not intended to specify who the members of Aither were or what percentage membership interest they held.[141] I find this not to be a credible interpretation. The five-year forecast specifically includes the "SVP [of] Business Development" under the "Owners" section of a table.[142]

---

[136] Defs. PT OB 24.

[137] *See* Tr. (A. Rostowsky) 22:2–11; Tr. (True) 238:6–239:20; JX7 (demonstrating that Hirsch was relying on Plaintiff's connections to secure a start-up loan).

[138] Tr. (A. Rostowsky) 44:5–9.

[139] *Id.* at 36:17–38:9; Tr. (True) 201:2–11, 254:11–255:2, 265:2–6.

[140] JX17a at 32.

[141] Defs. PT OB 24–25.

[142] JX17a at 32.

Further, True herself testified at trial that "SVP of business development" refers to Plaintiff.[143]

Finally, Defendants argue Plaintiff did not prove a promise was made because certain communications to third parties did not include him as a member of Aither. For instance, Defendants state that even after Plaintiff was released from his non-compete, he allowed Aither to submit license applications that excluded him as a member[144] and he failed to change marketing materials sent to prospective customers to include himself as a member.[145] I find this insufficient to rebut the clear evidence of the documentary record, taken as a whole. First, Plaintiff adequately explained that he was loathe to announce to potential customers a different ownership structure, lest confusion in the marketplace result.[146] Second, even if certain communications to third parties did not state that Plaintiff is a member, Defendants represented Plaintiff as a "Founder" in the updated business plan.[147] But, more importantly, Defendants also represented to Plaintiff *himself* that he had an ownership interest in Aither in several communications. Accordingly, I find, by clear and convincing evidence, that Plaintiff was promised an ownership interest in the Aither business by Defendants.

---

[143] Tr. (True) 249:13–15.
[144] Defs. PT OB 49.
[145] *Id.* at 29, 48–49.
[146] *See* Tr. (A. Rostowsky) 53:2–55:16, 154:14–155:17.
[147] JX97.

### b. Hirsch and True Promised a 15% Ownership Interest in Aither

Turning to the amount of Plaintiff's ownership interest in the LLC, I find that the record supports a finding that Plaintiff was promised a 15% ownership interest. Plaintiff asserts that he is entitled to a one-third interest,[148] as Hirsch and True orally or impliedly agreed to this ownership structure.[149] The record, to my mind, does not support such a finding. Upon receiving the email from True that confirmed that he held a 15% interest, Plaintiff did not object to such statement.[150] In addition, after the email exchange wherein True stated that Plaintiff was a "minority" interest holder, Plaintiff did not protest that he held a share equal to Hirsch and True.[151] This finding is consistent with the anticipated ownership structure of Significa Benefits, the company that the parties almost acquired and created an ownership structure for.[152] This latter fact is not dispositive, but is indicative of the Defendants' intention towards Plaintiff. I find that the parties understood that Plaintiff was promised a 15% ownership interest in Aither.

---

[148] Pl. PT OB 33. Plaintiff did not initially assert he held a one-third interest but did later in litigation. *See* Verified Member Deriv. Compl., Dkt. No. 1.
[149] Pl. PT OB 17–22.
[150] Tr. (A. Rostowsky) 63:8–14.
[151] *See id.* at 116:16–117:1; JX79.
[152] Tr. (True) 195:10–196:2; JX3.

## 2. The Record Demonstrates that Hirsch and True Reasonably Expected to Induce Action or Forbearance on Part of Plaintiff

Plaintiff's services provided to Aither without compensation[153] and the loan provided to Aither by Buffalo Enterprises[154] demonstrate that Hirsch and True reasonably expected to induce action or forbearance on part of Plaintiff. "The standard for testing expectation is an objective one."[155]

Plaintiff's conduct—uncompensated labor[156]—mirrored the conduct of an individual who expected to share in profits and losses. Hirsch and True also worked for this period of time without pay.[157] Only an *unreasonable person* in Hirsch's and True's position would expect a non-equity-holder to work for a long-extended period, at will and facing the possibility of termination before any interest vested, *without payment.* In contrast, a reasonable person would expect inducement of that conduct where there is an incentive, such as expecting to share in profits and losses through an ownership interest. In addition, upon reading Aither's business plan,[158] a reasonable person would infer that Plaintiff had an interest in the profitability of Aither and acted in accordance. Accordingly, I find by clear and convincing

---

[153] Tr. (A. Rostowsky) 36:13–37:2; Tr. (True) 200:17–201:11, 215:7–16, 254:11–255:2, 265:2–6.
[154] JX20.
[155] *Ramone v. Lang*, 2006 WL 905347, at *15 (Del. Ch. Apr. 3, 2006).
[156] Tr. (A. Rostowsky) 36:13–37:2; Tr. (True) 200:17–201:11, 215:7–16, 254:11–255:2, 265:2–6.
[157] Tr. (A. Rostowsky) 36:13–23, 38:1–3; Tr. (True) 201:2–5, 215:7–16.
[158] JX97.

evidence that Hirsch and True expected to induce action—uncompensated labor—on part of Plaintiff, from the promise of an ownership interest in Aither.

The loan provided to Aither by Buffalo Enterprises also supports a finding that Hirsch and True expected that Plaintiff would be induced to act based on their promise. Buffalo Enterprises is partly owned by Plaintiff's father, Richard.[159] Defendants expected Plaintiff to use his influence with his father,[160] an action incentivized by the promise of Plaintiff's ownership interest in Aither. In fact, True even texted Hirsch that Plaintiff's expected contribution to Aither was to "bring in the money and prospects – leave the rest to [them].[161]

The record demonstrates that Plaintiff did use his influence with his father. First, the loan was not a normal business loan—it was made without collateral.[162] Second, Richard testified that he only loaned the money because he expected Plaintiff to be a co-owner of Aither based on conversations with Defendants.[163] I

---

[159] Tr. (R. Rostowsky) 171:24–172:3.

[160] *See* JX7; Tr. (True) 238:6–239:4; Tr. (A. Rostowsky) 22:2–23:2.

[161] JX11.

[162] JX20; Tr. (R. Rostowsky) 182:16–19; Tr. (True) 251:19–21.

[163] Tr. (R. Rostowsky) 165:17–24, 166:12–14, 167:16–23, 168:13–169:3, 169:21–170:12. Defendants assert that any probative value of Richard's testimony is negated by Defendants' disclosure that Hirsch and True are the only members of the Company in the meeting minutes given to Steinberg on October 2, 2019 and Richard's failure to request the operating agreement from Defendants. Defs. PT OB 50. I find this argument to be unpersuasive. Given that the record does not indicate that Richard was aware of either the operating agreement or meeting minutes, these facts do not negate that Richard expected Plaintiff to be a co-owner of Aither. Tr. (R. Rostowsky) 171:2–5, 173:18–175:14. This is further supported by the fact that Richard knew Hirsch was aware of Plaintiff's desire to keep his involvement with Aither a secret, as discussed below. *Id.* at 171:6–23. Accordingly, I find that regardless of what the documents stated, Richard

find his testimony credible, in light of the terms of the loan. Given Plaintiff's relationship with the creditor (father–son), the favorable nature of the start-up loan, and Richard's testimony of his understanding of Plaintiff's interest in Aither based on conversations with Defendants, Defendants had reason to know that Plaintiff did rely on the promise of his ownership interest in Aither and "acted" by influencing his father. I find by clear and convincing evidence that Hirsch and True reasonably expected to induce action on part of Plaintiff (influencing his father to give Aither a loan from Buffalo Enterprises) in light of their promise to give him an ownership interest in Aither.

Defendants point out that they, and not Plaintiff, personally guaranteed the Buffalo Enterprises loan.[164] The argument is that there was no action or forbearance on part of Plaintiff because he did not make the loan or personally guarantee the loan—it was Buffalo Enterprises that "acted" by giving the loan.[165] I do not find this argument persuasive. Plaintiff did not need to have personally guaranteed the loan because the record, as discussed above, already shows action on part of Plaintiff that Defendants reasonably expected to induce—uncompensated labor and

---

expected Plaintiff to be a co-owner of Aither and was thus influenced by Plaintiff to offer this favorable loan to Aither at the request of Plaintiff.

[164] Defs. PT OB 50.

[165] *Id.* ("Plaintiff's contention that Buffalo Enterprises would not have given Aither the Loan but for his alleged ownership in the Company does not cure this fundamental deficiency – as it may have been Buffalo Enterprise's reliance but not Plaintiff's. Plaintiff did not make the Loan, and did not take on any risk for this financing; Defendants bore all of the risk alone. There is no legal basis for a claim of third-party reliance or reliance by proxy.").

influencing his father for the start-up loan. In addition, the record demonstrates that Plaintiff's personal guaranty was not necessary as Plaintiff's father, Richard, expected to be responsible for Plaintiff's portion of any liability.[166]

Defendants also assert that they could not reasonably expect that Plaintiff would be induced to act by a promise of an immediate ownership interest in Aither because their understanding of the agreement was that Plaintiff's ownership interest would vest after five years.[167] As I understand Defendants' argument, it is that if Plaintiff *was* induced to act, it must be based on this alleged agreement that Plaintiff's ownership interest would vest after five years. They assert that the parties' agreement was both conditional—on his remaining an at-will employee for the full term—and oral.[168]

I find this untenable. The record demonstrates that Hirsch and True asserted this version of the agreement of ownership interest only after this litigation began.[169] Further, it is not plausible that an employee would be induced to act, i.e., work without compensation for an extended period of time, solely with the expectation of an incentive—unvested—that *could* come to fruition five years in the future. Such an agreement, I note, would be difficult to enforce due to the statute of frauds,

---

[166] Tr. (R. Rostowsky) 170:16–171:1.
[167] Defs. PT OB 50–51.
[168] *Id.*; Tr. (True) 262:9–15, 263:10–265:6.
[169] *See* Tr. (A. Rostowsky) 70:5–24, 71:15–23.

making it even less plausible that an employee would be induced to act by such an agreement.[170]   In short, Defendants' arguments are not credible, and I find that Plaintiff has proved, under the clear and convincing standard, that Defendants reasonably expected to induce action on part of Plaintiff based on their promise of his ownership interest in Aither.

### 3. The Record Demonstrates that Plaintiff Reasonably Relied on Hirsch's and True's Promise and That He Took Actions to his Detriment

Plaintiff reasonably relied on Defendants' promise for his ownership interest in Aither and acted to his detriment because of the promise.  Plaintiff worked for Aither for eighteen months without compensation,[171] secured—through his connection with his father—the Company's start-up loan,[172] secured the Company's first client,[173] and contributed other services to the Company.[174]  Plaintiff testified that he would not have worked without pay unless he was an owner of Aither.[175]  I believe this testimony.  Plaintiff also demonstrated his belief that he was an owner, as he testified that he discussed with Defendants the Company's strategy, employee hiring, and finances at a high-level.[176] I find his testimony credible.

---

[170] 6 *Del C.* § 2714(a).
[171] Tr. (A. Rostowsky) 36:13–37:2; Tr. (True) 200:17–201:11, 215:7–16, 254:11–255:2, 265:2–6.
[172] Tr. (A. Rostowsky) 22:2–23:2; Tr. (True) 238:6–239:20; JX20.
[173] Tr. (A. Rostowsky) 44:5–9.
[174] *See id.* at 36:5–12, 49:23–50:5.
[175] *Id.* at 37:7–9.
[176] *Id.* at 49:23–50:5.

The record demonstrates that Hirsch and True were well aware of the extensive services that Plaintiff provided to Aither at the beginning stages of its formation, during its startup period, and when it became profitable. In addition, Plaintiff communicated his understanding of his ownership interest, over an extended period of time, to Defendants.[177] Defendants at no point in time during Plaintiff's eighteen-month tenure with Aither refuted his ownership interest nor explicitly made clear that he was simply an employee.[178] Thus, I find it was reasonable for Plaintiff to rely on Hirsch's and True's promise, and that he did so to his detriment.

Defendants point to marketing materials, filings, and minutes that stated Hirsch and True were the only owners of Aither.[179] Defendants argue that Plaintiff and Buffalo Enterprises were aware of these materials and did not refute them, which demonstrates that Plaintiff could not have reasonably relied on their promise.[180] I find this argument unpersuasive since the record demonstrates Plaintiff, Buffalo Enterprises, and Defendants had an incentive to keep Plaintiff's involvement in the Company a secret in light of Plaintiff's non-compete with S&S Healthcare, a fact

---

[177] *See id.* at 41:14–42:11, 42:19–43:1, 43:2–44:1, 44:21–45:22, 60:3–61:10; JX49.
[178] *Ramone*, 2006 WL 905347, at *16 (finding reasonable and detrimental reliance where promisor was aware of promisee's reliance and took no action to correct promisee's conduct based on the purported promise).
[179] Defs. PT OB 29–30, 52.
[180] *Id.*

that Hirsch and True were well aware of.[181]  I find that Plaintiff reasonably relied on Defendants' promise and took actions, including uncompensated labor, to his detriment.

### 4. The Promise is Binding Because Injustice Can be Avoided Only By Enforcement of the Promise

I find that an injustice can be avoided only by enforcing Hirsch's and True's promise to Plaintiff. Plaintiff introduced the connection to secure Aither's start-up loan.[182]  In turn, the record demonstrates that Hirsch and True used their association with Plaintiff to receive the loan.[183]  Plaintiff also contributed extensive services to Aither for eighteen months without pay.[184]  In addition, Plaintiff had continuous back and forth communications regarding the status of his ownership with Hirsch and True while being led on.[185]  The Company relied on and benefitted materially from the assistance and contributions that Plaintiff provided. Therefore, I find that it would be manifestly unjust to allow Hirsch and True reap the benefits of Plaintiff's contributions without fulfilling their promise to Plaintiff.

---

[181] *See* Tr. (R. Rostowsky) 171:6–23; Tr. (A. Rostowsky) 12:11–14:8; Tr. (True) 227:20–229:21, 253:7–23; JX2.
[182] Tr. (A. Rostowsky) 22:2–23:2; Tr. (True) 238:6–239:2.
[183] JX7 (demonstrating that Hirsch was relying on Plaintiff's connections to secure a start-up loan); Tr. (R. Rostowsky) 168:13–169:3.
[184] Tr. (A. Rostowsky) 36:13–37:2; Tr. (True) 200:17–201:11, 215:7–16, 254:11–255:2, 265:2–6.
[185] *See* Tr. (A. Rostowsky) 41:14–43:1, 43:2–44:1, 44:21–45:22, 60:3–17; JX49.

## III. CONCLUSION

For the foregoing reasons, I find that Plaintiff pursuant to promissory estoppel has a 15% ownership interest in Aither. How equity should act to vindicate this interest remains for further consideration. The parties should submit a form of order consistent with this Memorandum Opinion.